**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| DEBORAH LA SCOLA, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:24-cv-00564-JSD |
| SSM MEDICAL GROUP, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION FOR DIRECTED VERDICT AT THE CLOSE OF
PLAINTIFF'S EVIDENCE**

Plaintiff Deborah La Scola, M.D. ("Plaintiff" or "Dr. La Scola"), by and through

counsel, for her Motion for Directed Verdict against Defendants SSM Medical Group, Inc.

("SSM") and St. Louis University ("SLU" and, collectively with SSM, "Defendants") on the

issue of Defendants' status as joint employers, states as follows:

**INTRODUCTION**

Plaintiff has now been fully heard on the issue of Defendants' status as joint

employers, and the trial record allows for only one conclusion: SSM and SLU jointly employed

Dr. La Scola as a matter of law.  Through uncontroverted testimony, admitted exhibits, and

Defendants' own corporate admissions, the evidence establishes that SSM exercised

substantial, day-to-day control over every material aspect of Plaintiff's employment,

including her initial offer of employment effective July 1, 2019, work location, daily schedule,

clinical duties, compensation structure, and employment records.  No reasonable jury could

conclude otherwise.  Where, as here, the evidence is not merely sufficient but one-sided with

respect to the factors comprising the "economic realities" test favored in the Eighth Circuit,

Rule 50(a) requires the Court to remove the issue from the jury and enter judgment as a

matter of law.  Plaintiff is therefore entitled to a directed verdict on Defendants' status as

joint employers.

1

**STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 50(a)(1), judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  For the reasons set forth below, Plaintiff is entitled to judgment as a matter of law on the issue of Defendants' status as joint employers.

**ARGUMENT**

The Equal Pay Act ("EPA") is encompassed by the Fair Labor Standards Act ("FLSA"). *See* generally 29 U.S.C. § 206(d).  The FLSA broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d).  "Once it is determined that one is a joint employer of an employee the joint employer is responsible for compliance with the EPA." *EEOC v. State of Mo., Dept. of Social Services, Div. of Corrections*, 617 F. Supp. 1152, 1158 (E.D. Mo. 1985).

An employee may have multiple employers that are simultaneously liable under the FLSA where the evidence shows that separate persons or entities exercise some level of control over the employee.  *Childress v. Ozark Delivery of Mo. L.L.C.*, 95 F. Supp. 3d 1130, 1138-39 (W.D. Mo. 2015) (citation omitted).  The FLSA defines the employment relationship "expansively" and with "striking breadth" that "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

Just last year, the Honorable Henry E. Autrey recognized that courts in the Eighth Circuit generally apply the "economic realities" analysis to the issue of joint-employer status, as articulated in *Childress*, 95 F. Supp. 3d at 1139.  *See Chavez-Dereme v. Levering Reg'l*

2

*Health Care Ctr., L.L.C.*, No. 4:21-CV-182 HEA, 2025 WL 2442873, at *7 (E.D. Mo. Aug. 25, 2025). Specifically, in *Chavez*, Judge Autrey noted the following:

> The Eighth Circuit has not articulated a test for determining whether an entity is a joint employer, but courts in the Eighth Circuit have considered the following four factors: (1) whether the entity had the power to hire and fire employees, (2) whether it supervised and controlled employee work schedules or conditions of employment, (3) whether it determined the rate and method of payment, and (4) whether it maintained the employees' employment records.

*Chavez-Dereme v. Levering Reg'l Health Care Ctr., L.L.C.*, No. 4:21-CV-182 HEA, 2025 WL 2442873, at *7 (E.D. Mo. Aug. 25, 2025) (citing *Childress*, 95 F. Supp. 3d at 1139).

"These factors are not exhaustive and no one factor is dispositive." *Id.* "Although courts apply different and varying factors in applying the economic realities analysis, the overarching concern is whether the alleged employer possessed direct or indirect power to control significant aspects of the plaintiff's employment." *Id.*

It is uncontested in this case that Dr. La Scola was employed by SLU from July 1, 2019, to June 30, 2022. For the reasons set forth in detail below, and based on the facts presented at trial, Dr. La Scola has proven, as a matter of law, that she was jointly employed by SSM and SLU from July 1, 2019, to June 30, 2022.

## A.    SSM Had Power to Hire and Fire Plaintiff

The undisputed trial evidence establishes that SSM possessed—and exercised— effective authority over Dr. La Scola's hiring and continued employment. Steve Schoeck, SSM's corporate representative, testified that SSM deployed Dr. Sammer Siddiqui, then a SLU employee, to recruit urologists and place them in SSM community hospitals. Further, Exhibit 62 was admitted into evidence. Exhibit 62 establishes that in 2019, a recruiter employed by SSM contacted Dr. La Scola and passed her resume along to Dr. Siddiqui. Exhibit 63 was also admitted into evidence. Exhibit 63 establishes that Dr. Siddiqui sent Mr. Schoeck, Kyle Grate, and Teresa Kenney—all SSM employees—Dr. La Scola's letter of

3

intent from SLU, i.e., her *offer of employment*, for feedback and approval prior to sending it to Dr. La Scola.  In Exhibit 63, Dr. Siddiqui acknowledges that Dr. La Scola's "contract" from SLU is "contingent on a formal agreement with the PSA."  Stated differently, SLU needed approval from SSM to make Dr. La Scola an offer of employment.  At minimum, this evidence demonstrates that SSM held functional veto power over Dr. La Scola's employment—a hallmark of joint-employer status that no reasonable jury could disregard.

The "PSA" was entered into evidence as Exhibit W7.  Dr. Siddiqui and Mr. Schoeck confirmed that the PSA is the vehicle through which SLU and SSM offered Dr. La Scola her position at SSM Health St. Joseph Hospital - Lake St. Louis ("SJ-LSL") in 2019.  The PSA modifies the Academic Affiliation and Services Agreement ("AAA") between SLU and SSM. The AAA was entered into evidence as Exhibit 70.  The PSA was executed by SSM Health's Regional President and SLUCare's Senior Associate Dean for Clinical Affairs and authorizes SLU to hire two full time urologists at SJ-LSL.  In Mr. Schoeck's own words, the AAA created a "partnership" and a "symbiotic relationship" between SSM and SLU.

Exhibit V4 was admitted into evidence.  Exhibit V4 demonstrates that, even before Dr. La Scola executed a formal employment agreement with SSM, she was required to operate a clinic at SJ-LSL for a minimum of forty hours per week and under a mandate that all surgeries she performed would "be performed at SJ-LSL or another SSM site." Dr. Siddiqui confirmed in his testimony that SJ-LSL has the ability to revoke a physician's privileges at the hospital if the physician fails to comply with the hospital's bylaws.  If SLU required Dr. La Scola to see all patients and perform all surgeries at SJ-LSL (or another SSM site), and SJ-LSL had the ability to revoke Dr. La Scola's privileges, then SSM clearly had the ability to terminate Dr. La Scola's employment even prior to July 1, 2022.  Accordingly, Plaintiff has presented sufficient evidence that Defendants meet the first factor for the Court

to find joint-employer status as a matter of law.  *See Chavez-Dereme*, 2025 WL 2442873, at *7 (citing *Childress*, 95 F. Supp. 3d at 1139).

**B.      SSM Supervised and Controlled Plaintiff's Work Schedule and Conditions of Employment**

The evidence is equally clear that SSM controlled the manner, means, and day-to-day conditions of Dr. La Scola's work.  The PSA (Exhibit W7), which is the vehicle by which Dr. La Scola was hired in July of 2019, provides "SLU*Care* shall provide professional medical Urology services for SSM Medical Group, Inc. ('SSMMG') at SSM Health St. Joseph Hospital - Lake St. Louis ('SJ-LSL') and other agreed upon locations."  The PSA further dictates that the physician(s) hired via the PSA has/have the following duties: "Provide professional services in the specialty of Urology at SJ-LSL which shall include clinic hours, hospital hours and a Physician's presence at an SSM Site . . . . In conjunction with urologists on the medical staff at SJ-LSL, Physicians shall provide emergency room and inpatient call coverage *in accordance [with] medical staff bylaws*."  (Emphasis added).  Dr. Siddiqui confirmed in his testimony that he did not provide any day-to-day supervision of Dr. La Scola, and he never performed a performance review on her.  He also confirmed that all direct oversight of Dr. La Scola would have come from the Chief Medical Officer of SJ-LSL—an SSM employee.

Dr. La Scola testified that, although her official title was "assistant professor," she never worked with medical students, never worked with residents, and had no academic or teaching requirements at all.  Dr. Siddiqui confirmed this in his testimony.  Further, Mr. Schoeck agreed that Dr. La Scola had no time to go to SLU and teach a class, because she was contractually required to spend her full time at SJ-LSL.

In addition, Dr. La Scola testified that the only hospital she ever worked in was SJ-LSL.  SSM provided her with the medical supplies and surgical instruments she used to do her job and employed the staff who assisted her in the clinic.  Mr. Schoeck confirmed that

SSM owned or leased all equipment that Dr. La Scola used in the clinic.    Further, Dr. La Scola testified that, at all times, she was obligated to follow the policies and procedures of SSM when working at SJ-LSL.

Additionally, Dr. La Scola, Dr. Thomas Landon, and Lorraine Bruesch confirmed in their testimony that Dr. La Scola's work schedule was controlled by SSM.  SSM controlled the hours of operation of the clinic where she saw patients, and the call schedule was jointly created by Dr. La Scola and Dr. Landon and then given to SSM staff to carry out with the exchange line operator.  Dr. La Scola's patient appointment schedules were controlled by medical assistants employed by SSM, and Ms. Bruesch confirmed that all supplies for Dr. La Scola's clinic were ordered by her via SSM—she never ordered clinic supplies for Dr. La Scola via SLU.

Furthermore, there was ample testimony elicited that, when Dr. La Scola had concerns about clinic management, she went to *SSM's* human resources department, who confirmed it had an obligation to investigate her complaint.  Consider also the most significant condition of Dr. La Scola's employment – her partnership with Dr. Landon.  That partnership was controlled by SSM.  Steve Schoeck testified that he hired Dr. Landon and placed him in the SJ-LSL clinic that Dr. La Scola was, at that point, already running by herself.  From then on, Dr. La Scola and Dr. Landon operated a *joint* clinic– and Dr. Landon works for an SSM entity.  Dr. Landon testified that he has been involved with recruiting and building the urology department at SSM – the very same department that Dr. La Scola worked in.  Plaintiff and Dr. Landon shared equipment, call burden, covered each other's patients, and worked out of the same operating rooms and clinic office.  When Dr. Landon needed help covering patients in the emergency department, he confirmed in his own testimony that he could call Dr. La Scola, and she would step in.  Each aspect of this

6

partnership – the shared space, the shared tools, the shared scheduling – was controlled and orchestrated by SSM.

This level of operational control goes well beyond coordination—it is direct supervision of core employment functions and certainly satisfies the second factor for joint-employer status. *See Chavez-Dereme*, 2025 WL 2442873, at \*7 (citing *Childress*, 95 F. Supp. 3d at 1139).

## C.   SSM Determined the Rate and Method of Payment

In substance, if not form, SSM determined both the amount and structure of Dr. La Scola's compensation—confirming joint control under the economic realities test. The PSA (Exhibit W7), which was executed by both SSM and SLU, stated that the physician(s) hired via the PSA would be paid "a mutually agreed actual physician compensation (not to exceed $450,000 per year)." In other words, and because Dr. La Scola's offer of employment was contingent on execution of the PSA, *see* Exhibit 63, SLU and SSM jointly determined the rate of Dr. La Scola's payment. The rate of her payment it was contractually required to be "mutually agreed" between SSM and SLU—the two parties to the PSA and Dr. La Scola's joint employers.

Moreover, SSM and SLU jointly controlled the method of Dr. La Scola's payment to satisfy the third factor above. *See Chavez-Dereme*, 2025 WL 2442873, at \*7 (citing *Childress*, 95 F. Supp. 3d at 1139). Dr. Siddiqui confirmed in his testimony that while Dr. La Scola may have received a paycheck from SLU prior to July 1, 2019, all of her compensation and benefits paid to her were ultimately reimbursed to SLU by SSM from the inception of her employment on July 1, 2019, to her termination effective December 31, 2022.

## D.   SSM Maintained Plaintiff's Employment Records

The facts and testimony adduced at trial further show that SSM maintained Dr. La Scola's employment records.  Dr. La Scola, Dr. Landon, and Ms. Bruesch confirmed in their testimony that Dr. La Scola's call schedule was created and maintained by SSM.  Her wRVU data was created and maintained by SSM.  The report she made to human resources, and the documents reflecting the cultural assessment that was performed in her response to her complaint, were maintained by SSM.  Further, even prior to July 1, 2022, Dr. La Scola had and maintained an SSM email address, deborah.lascola@ssmhealth.com.  *See, e.g.,* Exhibit H9, dated April 14, 2022.  Comparatively, Dr. Siddiqui, who claims to have been employed only by SLU before July 1, 2022, maintained a SLU email address, sameer.siddiqui@health.slu.edu.  *See, e.g.*, Exhibit 66, dated May 6, 2021.

The maintenance of these essential employment records by SSM further underscores its role as Dr. La Scola's employer in every practical sense and in satisfaction of the fourth factor for joint-employer status. *See Chavez-Dereme*, 2025 WL 2442873, at *7 (citing *Childress*, 95 F. Supp. 3d at 1139).

E.    ***Hanley v. New York City Health and Hospitals Corp.***

The Southern District of New York recently examined circumstances similar to this case with respect to a radiologist.  *Hanley v. New York City Health and Hospitals Corp.*, 722 F. Supp. 3d 112, 118 (S.D.N.Y. 2024).  In *Hanley*, the plaintiff was employed by a university but assigned to work in an independent hospital pursuant to an affiliate agreement between her employer-university and a medical group.  *Id.* at 120.  Pursuant to the agreement, the university "employ[ed] radiologists as academic staff subject to renewable term appointments and then recommend[ed] them for assignment as clinical practitioners" at a hospital owned by the medical group.  *Id.* at 118.  Plaintiff sued both the university and the medical group for discrimination.  *Id.*  The medical group moved for summary judgment on the plaintiff's statutory discrimination

claims in part by denying the existence of an employer-employee agreement between itself and the plaintiff. *Id.* at 119.

The court in *Hanley* held that the university and the medical group were the plaintiff's "joint employers" under the terms of the parties' affiliate agreement. *Id.* at 120.  The court noted: (1) the medical group controlled the "manner and means" by which the plaintiff performed her clinical duties at the hospital in which she was staffed; (2) the plaintiff's clinical duties at the hospital made up the majority of her day-to-day work, and such work was subject to ongoing review by hospital staff; and (3) although the plaintiff was "formally paid by [the university], [the medical group] reimbursed the university for "95% of her salary." *Id.*  Additionally, the court emphasized that while the plaintiff "may have been formally hired" by the university, "her employment contract recommended her independent appointment" to the hospital and "made that appointment a necessary condition of her continued employment" by the university.  *Id.*

The facts elicited at the trial of *this* case are functionally identical.  SSM controlled the manner and means by which Dr. La Scola performed the clinical duties at SJ-LSL: it controlled her schedule, her equipment, her supplies, and her assisting staff.  Dr. La Scola's clinical duties at SJ-LSL constituted the entirety of her practice: she did not practice medicine at any other hospital or provide services for any other entity other than SSM.  Mr. Schoeck confirmed in his testimony that all of Dr. La Scola's services to patients were billed by SSM to those patients, paid by the patients to SSM, and SSM received revenue for those services.  Mr. Schoeck confirmed that SSM was tracking Dr. La Scola's wRVUs, even before she received her contract.  Finally, although Dr. La Scola received her paystubs from SLU prior to June 30, 2022, Dr. Siddiqui confirmed that SSM reimbursed SLU for 100% of her compensation.

The parallels to *Hanley* are not merely persuasive—they are striking.  As in that case, Dr. La Scola was formally employed by a university yet functioned entirely within, and for the

9

benefit of, a separate medical entity that controlled her day-to-day work.  Here, as in *Hanley*, that entity dictated clinical operations, controlled working conditions, and funded Dr. La Scola's compensation.  If joint-employer status was appropriate there, it is compelled here.  No reasonable jury could distinguish the two.

**CONCLUSION**

For all of these reasons, and based on the uncontroverted trial record, Plaintiff has established that SSM and SLU were her joint employers as a matter of law from July 1, 2019, to June 30, 2022.  Because the evidence permits only one reasonable conclusion, Rule 50(a) requires that the issue be withdrawn from the jury.  Plaintiff respectfully requests that the Court enter judgment as a matter of law in her favor on Defendants' status as joint employers.

Date: June 25, 2026                              Respectfully submitted,


                                                 **BLITZ, BARDGETT & DEUTSCH, L.C.**

                                                 */s/ Andrew W. Blackwell*
                                                 Kelley F. Farrell, #43027
                                                 Andrew W. Blackwell, #64734
                                                 Ellen J. Bruntrager, #73649
                                                 120 S. Central Avenue, Ste. 1500
                                                 St. Louis, MO 63105
                                                 Phone:  314-863-1500
                                                 kfarrell@bbdlc.com
                                                 ablackwell@bbdlc.com
                                                 ebruntrager@bbdlc.com

                                                 ***Attorneys for Plaintiff Deborah La Scola, M.D.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 25, 2026 counsel for Plaintiff served the foregoing on Defendants' counsel of record and the Court via the Court's electronic filing system.

*/s/ Andrew Blackwell*