**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| DEBORAH LA SCOLA, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-00564-JSD |
| | ) | |
| SSM MEDICAL GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF DEBORAH LA SCOLA'S RENEWED MOTION FOR JUDGMENT AS A <u>MATTER OF LAW AND REQUEST FOR NEW TRIAL</u>**

COMES NOW Plaintiff Deborah La Scola, M.D. ("Plaintiff" or "Dr. La Scola"), through her undersigned attorneys, and pursuant to Fed. R. Civ. P. 50 and 59 renews her motion for judgment as a matter of law (Doc. 142), and jointly requests a new trial on claims not submitted to the jury in this matter related to pre-July 1, 2022 conduct ("Motion").

i

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

PROCEDURAL BACKGROUND ................................................................................... 2

STANDARD OF REVIEW ............................................................................................. 3

GOVERNING LAW ...................................................................................................... 4

ARGUMENT ................................................................................................................. 5

A.    The Contractual Language of the Academic Affiliation Agreement and Physician Services Agreement between SSM and SLU Created a Joint Employer Relationship ................................................................................ 6

        1.    *The Academic Affiliation Agreement (AAA)* ........................................ 6

        2.    *The Physician Services Agreement (PSA)* ............................................ 8

        3.    *Plaintiff's Faculty Appointment Letter* ............................................... 10

        4.    *None of the Governing Agreements Disclaims or Denies Joint-Employer Status* ................................................................................ 11

B.    The Evidence Adduced at Trial Supported Judgment for Plaintiff Under Each Factor of the Economic Realities Test ........................................................... 12

        1.    *Defendants Jointly Had Power to Hire and Fire Plaintiff* ................... 12

        2.    *Defendants Jointly Supervised Plaintiff's Work Schedules and Conditions of Employment* .................................................................. 15

        3.    *Defendants Jointly Determined the Rate and Method of Plaintiff's Payment* .............................................................................................. 17

        4.    *Defendants Jointly Maintained Plaintiff's Employment Records* ........ 18

C.    Courts Across Jurisdictions Have Found Joint Employer Status in Similar Employment Arrangements ............................................................................ 20

        1.    *Eighth Circuit* ..................................................................................... 20

        2.    *Southern District of New York District Court* ..................................... 21

        3.    *Southern District of Ohio District Court* ............................................ 23

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page Number**

*Childress v. Ozark Delivery of Mo. L.L.C.*, 95 F. Supp. 3d 1130 (W.D. Mo. 2015) .........*passim*

*EEOC v. State of Mo., Dept. of Social Services, Div. of Corrections*, 617 F. Supp. 1152 (E.D. Mo. 1985) ...................................................................................................................4

*Gilliland v. Continental Land Staff, LLC*, No. 1:17-CV-191, 2019 WL 5068651 (D.N.D. Oct. 9, 2019)...................................................................................................................11

*Hanley v. New York City Health & Hospitals Corp.*, 722 F. Supp. 3d 112 (S.D.N.Y. 2024) ...... ...................................................................................................................21, 22, 23

*Hunt v. State of Missouri Department of Corrections*, 297 F.3d 735 (8th Cir. 2002) .......20, 21

*Karlson v. Action Process Serv. & Priv. Investigations, LLC*, 860 F.3d 1089 (8th Cir. 2017).... ...................................................................................................................27

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992).........................................................4

*Oleksa v. Know Ink, LLC*, No. 4:25-CV-1809 PLC, 2026 WL 860451 (E.D. Mo. Mar. 30, 2026) ...................................................................................................................5

*Phillips v. Collings*, 256 F.3d 843 (8th Cir. 2001)...................................................................4

*Rosenberg v. Fairfield Medical Center*, No. 18-CV-1111, 2021 WL 3562916 (S.D. Ohio Aug. 12, 2021)...................................................................................................23, 24, 25

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947)...........................................................5

*Sedlacek v. Hack*, 752 F.2d 333 (8th Cir. 1985) ...........................................................26 n. 4

*Stevenson v. International Paper Co.*, 432 F. Supp. 390 (W.D. La. 1977) ......................26 n. 4

*Subcliff v. Brandt Engineered Prods., Ltd.*, 459 F. Supp. 2d 843 (S.D. Iowa 2006).................6

*Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003) .................................................5

Statutes

29 U.S.C. § 203(d) ...................................................................................................................4

29 U.S.C. § 206(d) .................................................................................................*passim*

42 U.S.C. § 2000e *et seq*.................................................................................................*passim*

Rules

Fed. R. Civ. P. 15 ...................................................................................................................2

Fed. R. Civ. P. 50 ...............................................................................................................3, 4, 26

Fed. R. Civ. P. 59 ...................................................................................................................3, 26

**Trial Exhibit Index**

Exhibit 62 – February 5, 2019 Email Chain

Exhibit 63 – February 11, 2019 Email Chain

Exhibit 66 – May 6, 2021 Email identifying Dr. Siddiqui's SLU email address

Exhibit 70 - Academic Affiliation Agreement between SLU and SSM

Exhibit V4 - March 7, 2019 Faculty Appointment Letter from SLU

Exhibit C10 - June 2022 Email Chain

Exhibit H9 – April 14, 2022 Email Chain

Exhibit R4 – March 7, 2019 Email Chain

Exhibit W7 – Physician Services Agreement / AAA Change Request Form

Exhibit Z7 – wRVU Productivity Data

**INTRODUCTION**

At the close of the evidence in the trial of this case, this Court granted Defendants' joint motion for judgment as a matter of law on the issue of joint employment, concluding that Defendant SSM Medical Group, Inc. ("SSM") and St. Louis University ("SLU") were not joint employers and dismissing SLU from the case. (Doc. 148).  As a result, the jury was precluded from considering a significant portion of Plaintiff's wage-discrimination claims for the period between July 1, 2019, and June 30, 2022, and resulting damages.[1]

The trial record, however, established overwhelming and largely undisputed evidence that SSM and SLU jointly employed Plaintiff from July 1, 2019, through June 30, 2022.  The evidence showed that SSM and SLU jointly recruited Plaintiff, structured her position, controlled her compensation, and exercised substantial authority over her work conditions and clinical responsibilities.  Plaintiff worked exclusively at SSM facilities, treated SSM patients, generated revenue for SSM, and performed services pursuant to agreements that contemplated a coordinated and integrated relationship between SSM and SLU.

Under the governing economic-realities test, that evidence compels a finding of joint employment as a matter of law.  This finding is consistent with decisions from the Eighth Circuit and other courts addressing materially similar university and health system affiliations.  Accordingly, Plaintiff respectfully requests that the Court enter judgment as a matter of law in her favor on the issue of joint employment and grant a new trial on claims relating to discriminatory compensation.  Alternatively, if the Court concludes that joint

---

[1] In this Motion Plaintiff only seeks relief for wage discrimination claims under Title VII and the Equal Pay Act within the period between July 1, 2019, and June 30, 2022, subject to each statute's respective statute of limitations.  Plaintiff does not challenge any of the claims that were tried to the jury in this Motion.

employment presents a factual issue, Plaintiff requests a new trial so that a properly instructed jury may resolve that question.

## PROCEDURAL BACKGROUND

On April 18, 2024, Plaintiff filed her Complaint against Defendants SSM and SLU (Doc. 1).  In her Complaint, Plaintiff named Defendants as joint employers, specifically alleging "SSM and SLU were Dr. La Scola's joint employer because of an agreement between them and the common management, supervision, and ability to terminate services of faculty physician providers and SSM and SLU jointly controlled the means and methods of her work as urologist."  (Doc. 1, ¶ 16).  Plaintiff asserted four counts against Defendants jointly: (1) discrimination based on sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (2) hostile work environment based on sex; (3) retaliatory discharge under Title VII; and (4) violations of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1).

On May 20, 2026, this Court granted partial summary judgment in both Defendants' favor with respect to Plaintiff's hostile work environment claim (Count II), and in SLU's favor on Plaintiff's sex discrimination and retaliatory discharge claims under Title VII (Counts I and III).  (Doc. 105).  Plaintiff's claims for sex discrimination, wage discrimination, and retaliatory discharge under Title VII (Counts I-III and V) against SSM and her claim under the EPA (Count IV) against both Defendants proceeded to trial on June 17, 2026. Additionally, at trial, Plaintiff was given leave to amend her Complaint pursuant to Fed. R. Civ. P. 15(b) to assert a claim for wage discrimination under Title VII against Defendant SSM.[2]

---

[2] Plaintiff was given leave at trial to amend her Complaint *instanter* without filing a separate document and without need for Defendants to submit an answer.  For clarity and ease of reference, Plaintiff shall refer to her claim for wage discrimination under Title VII against Defendant SSM as Count V.

On June 25, 2026, all parties moved for judgment as a matter of law on Defendants' status as joint employers at the close of Plaintiff's evidence. (Docs. 142, 146, 147). That same day, this Court found in Defendants' favor on the issue of joint employment, holding "SSM Medical Group, Inc. and St. Louis University were *not* joint employers under the Equal Pay Act as a matter of law," and, therefore, "SLU [was] dismissed as a party to this case." (Doc. 148) (emphasis added). Accordingly, at the close of all evidence, the jury was instructed to consider *only* Plaintiff's employment and wages compared to members of the opposite sex performing work under similar working conditions during the period between July 1, 2022, and December 31, 2022 (Doc. 158, Instruction No. 33).

On June 26, 2026, the jury returned a verdict in favor of Defendant SSM on Counts I, IV, and V. The jury returned a verdict in Plaintiff's favor on Plaintiff's retaliatory discharge claim (Count III) and awarded Plaintiff $793,000.00 in lost wages, $285,500.00 in non-economic damages, and $5,750,000.00 in punitive damages. (Doc. 161, 162).

Plaintiff now renews her motion for judgment as a matter of law and jointly requests a new trial on (1) the issue of joint employment; and (2) Counts IV (wage discrimination under the EPA against SSM and SLU) and V (wage discrimination under Title VII against SSM) of her Complaint.

**STANDARD OF REVIEW**

Fed. R. Civ. P. 50 applies to Plaintiff's renewed motion for judgment as a matter of law and related motion for new trial. Where a party makes a motion for judgment as a matter of law before the case is submitted to the jury and the court denies such a motion, the party may, "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).

Pursuant to Fed. R. Civ. P. 50, judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for

3

a reasonable jury to find for that party on that issue . . ..” Fed. R. Civ. P. 50(a)(1); *see also*

*Phillips v. Collings,* 256 F.3d 843, 847 (8th Cir. 2001). In analyzing a motion for judgment as

a matter of law, the court must “draw all reasonable inferences in favor of the nonmoving

party without making credibility assessments or weighing the evidence.” *Phillips,* 256 F.3d

at 847.

In ruling on a Rule 50(b) motion, this Court may: (1) allow judgment on the verdict, *if*

*the jury returned a verdict*; (2) order a new trial; or (3) direct the entry of judgment as a matter

of law.” Fed. R. Civ. P. 50(b) (emphasis added). Here, the jury did not return a verdict on

the issue of joint employer status because this Court ruled in Defendants’ favor on their joint

motion for judgment as a matter of law on the issue of joint employer status.

### GOVERNING LAW

The Equal Pay Act (“EPA”) is encompassed by the Fair Labor Standards Act (“FLSA”).

*See* generally 29 U.S.C. § 206(d). The FLSA broadly defines an employer as “any person acting

directly or indirectly in the interest of an employer in relation to an employee . . ..” 29 U.S.C.

§ 203(d). “Once it is determined that one is a joint employer of an employee the joint employer

is responsible for compliance with the EPA.” *EEOC v. State of Mo., Dept. of Social Services, Div.*

*of Corrections*, 617 F. Supp. 1152, 1158 (E.D. Mo. 1985).

An employee may have multiple employers that are simultaneously liable under the

FLSA where the evidence shows that separate persons or entities exercise some level of

control over the employee. *Childress v. Ozark Delivery of Mo. L.L.C.*, 95 F. Supp. 3d 1130,

1138-39 (W.D. Mo. 2015) (citation omitted). The FLSA defines the employment relationship

“expansively” and with “striking breadth” that “stretches the meaning of ‘employee’ to cover

some parties who might not qualify as such under a strict application of traditional agency

law principles.” *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

Courts in the Eighth Circuit apply the "economic realities test" in determining joint employer status.  *See Oleksa v. Know Ink, LLC,* No. 4:25-CV-1809 PLC, 2026 WL 860451 (E.D. Mo. Mar. 30, 2026).  Specifically:

> In determining whether an employer is a joint employer under the FLSA, courts within the Eighth Circuit consider the totality of the circumstances. The analysis typically starts with a review of four factors: (1) whether the alleged employer had the power to hire and fire the plaintiff; (2) whether the alleged employer supervised and controlled plaintiff's work schedules or conditions of employment; (3) whether the alleged employer determined the rate and method of payment; and (4) whether the alleged employer maintained plaintiff's employment records.

*Childress*, 95 F. Supp. 3d at 1139.  The factors enumerated above are "not exhaustive" and "no one factor is dispositive."  *Id.*  "For example, the Supreme Court "held that, in certain circumstances, an entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours, or pay them." *Id.* (quoting *Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61, 70 (2d Cir.2003) (citing *Rutherford Food Corp. v. McComb,* 331 U.S. 722 (1947)).

"Although courts apply different and varying factors in applying the economic realities analysis, ***the overarching concern is whether the alleged employer possessed direct or indirect power to control significant aspects of the plaintiff's employment***." *Childress*, 95 F. Supp. 3d at 1139 (emphasis added).

## ARGUMENT

For the reasons set forth below, Plaintiff proved as a matter of law that from the day she began working as a urologist at SSM St. Joseph, Lake St. Louis Hospital ("SJ-LSL") on July 1, 2019, through June 30, 2022, SSM and SLU jointly employed her by exercising shared control over significant aspects of her employment.

**A.** **The Contractual Language of the Academic Affiliation Agreement and Physician Services Agreement between SSM and SLU Created a Joint Employer Relationship**

Three relevant contracts between SSM, SLU, and Plaintiff governed Plaintiff's joint employment: (1) the Academic Affiliation and Services Agreement ("AAA") between SLU and SSM, which was admitted into evidence at trial as Exhibit 70; and (2) the Physician Services Agreement ("PSA") or AAA Change Request Form, which was admitted into evidence at trial as Exhibit W7; and (3) Plaintiff's faculty appointment by SLU, which was admitted into evidence as Exhibit V4.

These contracts are relevant because, in addition to the common law test regarding joint employer status, the contractual terms on the face of a written service agreement and employment contract can establish a "tripartite relationship" between two joint employers and their shared employee. *See Subcliff v. Brandt Engineered Prods., Ltd.*, 459 F. Supp. 2d 843, 854 (S.D. Iowa 2006).

**1.** *The Academic Affiliation Agreement (AAA)*

The Academic Affiliation Agreement ("AAA") became effective on September 1, 2015. The AAA was executed by, among others, Saint Louis University ("SLU") and SSM Health Care Corporation d/b/a SSM Health. At trial, SSM's corporate representative, Steve Schoeck, described the relationship created by the AAA as both a "partnership" and a "symbiotic relationship." His characterization accurately reflects the language and purpose of the agreement itself.

The AAA expressly provides that SSM and SLU intended to affiliate to create "a *functionally integrated regional healthcare system* that is cost-effective, responsive to community needs, dedicated to academic and clinical excellence and operated on a sound financial basis." Exhibit 70, p. 5 (emphasis added). The agreement further states that the

6

parties entered into a Master Agreement under which they would "***jointly*** promote, support and govern" SSM Health Care St. Louis as an academically affiliated healthcare system. *Id.* (emphasis added).

The stated purposes of the AAA likewise demonstrate a collaborative and integrated enterprise rather than two separate and independent operations. Specifically, SSM and SLU agreed: (1) to ensure that SSM entities had access to an adequate number of highly qualified physicians and residents; (2) to ensure that SLUCare continued to advance the shared missions of the parties by providing high-quality hospital, ambulatory, and physician services; and (3) to further enhance the reputation of SSM entities, their affiliates, and SLUCare as a leading regional healthcare system offering ***integrated teaching, training, research, and clinical services***. Exhibit 70, p. 6 (emphasis added).

In other words, the AAA imposed concrete operational obligations that required SSM and SLU to work together in staffing and managing physician services. Specifically, the agreement obligated SSM-affiliated entities to obtain physician staffing and clinical coverage from SLUCare and required SLUCare to provide those services. The AAA states:

> Throughout the Term [of the AAA], the [SSM Health Care St. Louis] Entities will commit to purchasing from SLUCare, and SLUCare will commit to provide, customary and needed clinical coverage/call, 'volume services' and assured staffing for (a) the [Academic Medical Center] Hospitals . . . and (b) for other [SSM Health Care St. Louis] Facilities as may be mutually agreed by SLU and [SSM Health Care St. Louis] . . ..

Exhibit 70, p. 12.

Thus, by its express terms, the AAA established an integrated relationship in which SSM depended upon SLU to recruit, supply, and staff physicians throughout the SSM system. The agreement repeatedly emphasizes joint governance, shared objectives, integrated operations, and coordinated physician staffing. Far from functioning as independent entities, SSM and SLU deliberately structured their relationship so that each exercised significant

7

influence over the provision of physician services, supporting Plaintiff's contention that they operated as joint employers for the entire duration of her employment as a urologist at SJ-LSL.

### 2.     *The Physician Services Agreement ("PSA")*

Dr. Sameer Siddiqui and Steve Schoeck both testified that the PSA was the mechanism through which Plaintiff was hired for the position of urologist at SJ-LSL in 2019. The PSA modified and implemented the broader terms of the AAA and provides direct evidence of the manner in which SSM and SLU collaborated in recruiting, hiring, compensating, and supervising Plaintiff.  The PSA was executed by SSM Health's Regional President and SLUCare's Senior Associate Dean for Clinical Affairs and specifically authorized SLU to hire two full-time "SLUCare employed or independently contracted physicians" to provide "professional medical urology services for SSM Medical Group, Inc. ("SSMMG") at SSM Health St. Joseph Hospital–Lake Saint Louis ("SJ-LSL") and other agreed upon locations." Exhibit W7, p. 5.  The PSA was executed in March 2019, with an effective date of April 1, 2019.

Consistent with the broader purpose of the AAA, the PSA required SLU to hire up to two physicians, one of which was Plaintiff, so that these physicians could provide "a minimum of forty (40) hours per week" of professional urology services at SJ-LSL.  Via the PSA, SSM and SLU jointly defined the scope of Plaintiff's duties, agreeing that her position would include clinic hours, hospital hours, and a physician presence at an SSM facility. The PSA further required Plaintiff, "in conjunction with urologists on the medical staff at SJ-LSL," to "provide emergency room and inpatient call coverage in accordance [with] medical staff bylaws." Exhibit W7, p. 5. Notably, the PSA also required Plaintiff, as the first physician hired via the PSA to provide urological services at SJ-LSL, to have an ambulatory clinic and

practice urology *exclusively* at SJ-LSL, further demonstrating that Plaintiff was jointly hired by SLU and SSM to fulfill SSM's operational and staffing needs.

The PSA likewise demonstrates that SSM and SLU jointly controlled the financial terms of Plaintiff's employment. Under the agreement, SSM agreed to fund Plaintiff's compensation and benefits through payments made to SLUCare. Specifically, the PSA provides:

> For each [Full Time Equivalent] Physician, SSMMG shall pay SLUCare a monthly rate based **on a mutually agreed actual physician compensation (not to exceed $450,000 per year)** ("Base Compensation"), benefit costs equal to 17.25% of Base Compensation, and actual malpractice costs not to exceed $25,000 ("Total Base Compensation"). SLUCare shall be eligible to earn, in addition to Base Compensation, additional compensation ("Incentive Compensation") at the rates per Work Relative Value Unit ("wRVU") for each wRVU produced by each Physician in excess [of] the thresholds noted below. . . . SSMMG shall provide the wRVU data to SLU each month by the 10th calendar day of each month for the prior month's services.

Exhibit W7, p. 5 (emphasis added).  In other words, the contract between SSM and SLU mandated that the parties *jointly* determine Plaintiff's compensation and set a ceiling the parties could not exceed with respect to her maximum annual salary.

The PSA imposed additional financial obligations on SSM. Specifically, SSM agreed to pay SLUCare an administrative overhead fee equal to 17% of Plaintiff's total base compensation and to reimburse SLUCare up to $15,000 for Plaintiff's relocation and travel expenses.  Exhibit W7, p. 1.  At the same time, SSM retained all revenue generated from Plaintiff's urology services provided to SJ-LSL patients.  Exhibit W7, p. 6.

Taken together, the PSA confirms that Plaintiff cannot accurately be classified as solely employed by SLU during the initial period of her employment at SJ-LSL from July 1, 2019, to June 30, 2022. Rather, SSM and SLU jointly created Plaintiff's position, jointly defined her job duties, jointly structured, determined, and funded her compensation, and coordinated her clinical responsibilities to meet SSM's staffing and operational needs. The

9

PSA therefore proves that both entities exercised substantial control over significant aspects of Plaintiff's employment, supporting a finding of joint-employer status as a matter of law.

### 3.    *Plaintiff's Faculty Appointment Letter*

Finally, Plaintiff's March 7, 2019 faculty appointment letter from SLU was admitted into evidence.  *See* Exhibit V4.  Significantly, the letter closely mirrored the terms of the PSA, which was executed approximately two weeks later, further demonstrating that Plaintiff's employment arrangement was the product of coordinated planning between SLU and SSM rather than independent action by either entity.

Consistent with the PSA, the appointment letter stated that Dr. Siddiqui would recommend Plaintiff for appointment as an Assistant Professor, Non-Tenure Track, in the urological services at SSM Health St. Joseph Hospital–Lake Saint Louis."  Exhibit V4.  The letter further provided that Plaintiff would serve as "a full-time physician" and work a minimum of forty hours per week in an "ambulatory clinic."

The appointment letter also tied Plaintiff's clinical responsibilities directly to SSM facilities.  It provided that "all surgery for patients seen in clinic at SJ-LSL will be performed at SJ-LSL or at another SSM site."  Likewise, mirroring the PSA, the letter required Plaintiff to provide "emergency room and inpatient call coverage" in conjunction with the urologists on the SJ-LSL medical staff.  These provisions demonstrate that Plaintiff's day-to-day clinical duties, work location, and call responsibilities were structured around SSM's operational needs and integrated with SSM's existing physician workforce.

Equally telling is what the letter did not require.  Although Plaintiff was classified as an "Assistant Professor," Dr. Siddiqui expressly advised that he did not have "any set expectations of scholarly activity" for Plaintiff.  Thus, notwithstanding Plaintiff's nominal faculty status, the position contemplated by the appointment letter was overwhelmingly clinical in nature and centered on the provision of urological services for SSM patients at

10

SSM facilities. The reality of this provision of her faculty appointment letter was underscored by Plaintiff and Dr. Siddiqui's trial testimony – both confirmed that Plaintiff never taught classes, never supervised residents, and never worked with medical students. In fact, she was never even listed on SLU's website as an assistant professor and never attended any faculty meetings at SLU. She functioned entirely as an SSM physician in a community hospital.

Viewed together, the faculty appointment letter and the PSA demonstrate the reality of Plaintiff's joint employment. Namely, the faculty appointment letter and PSA show that: (1) Plaintiff was hired to fill a clinical need identified by SSM; (2) work exclusively within SSM facilities; (3) perform services for SSM patients; and (4) integrate with SSM's then-existing and future medical staff. The substantial overlap between the two documents provides compelling evidence that SSM and SLU jointly structured, determined, and controlled significant aspects of Plaintiff's employment, supporting a finding of joint-employer as a matter of law.

### 4.    *None of the Governing Agreements Disclaim or Deny Joint-Employer Status*

Although not dispositive, the contractual relationships among SSM, SLU, and Plaintiff are an important consideration in the joint-employer analysis. *See Gilliland v. Continental Land Staff, LLC*, No. 1:17-CV-191, 2019 WL 5068651, at *5 (D.N.D. Oct. 9, 2019). In assessing whether a joint-employment relationship exists, courts within this Circuit have considered whether the governing agreements expressly disclaim or deny an employment relationship between the worker and the purported joint employer. *Id.* Where such disclaimers are absent, the contractual language may support a finding that multiple entities exercised authority over the employee. *See id.*

11

Here, none of the governing agreements contain any express disclaimer of joint-employer status or any language purporting to negate an employment relationship between Plaintiff and SSM.  To the contrary, the AAA, PSA, and Plaintiff's faculty appointment letter repeatedly emphasize the coordinated roles of SSM and SLU in recruiting, employing, compensating, and overseeing Plaintiff's work.

**B.**     **"The Evidence Adduced at Trial Supports Judgment for Plaintiff Under Each Factor of the Economic Realities Test"**

The evidence and testimony presented at trial established as a matter of law that Plaintiff's employment relationship with SSM prior to July 1, 2022, met each of the four factors of the economic realities test.  *See Childress*, 95 F. Supp. 3d at 1139.

**1.**     ***Defendants Jointly had Power to Hire and Fire Plaintiff***

In addition to the contractual documents, Dr. Siddiqui, Steve Schoeck, and Plaintiff each testified regarding the circumstances surrounding Plaintiff's recruitment and hiring in 2019.  Their testimony established a coordinated hiring process involving both SSM and SLU.  Each witness confirmed that Plaintiff was initially contacted about the SJ-LSL urology position by an SSM recruiter.  After speaking with the recruiter, Plaintiff was directed to interview with Dr. Siddiqui, who was then serving as Interim Chair of SLU's Department of Surgery.  Thus, from the outset, Plaintiff's recruitment was not conducted by either entity acting independently.  Rather, SSM and SLU worked together to identify, recruit, and hire Plaintiff for a position designed to serve SSM's clinical needs.

The documentary evidence corroborates that testimony.  Exhibit 62, an email chain between Teresa Kenney, SSM Health's Lead Physician Recruiter, and Dr. Siddiqui, underscores the coordinated nature of Plaintiff's recruitment.  On February 5, 2019, Dr. Siddiqui informed Ms. Kenney:

12

Regarding Dr. La Scola, we have been speaking on the phone regularly including tonight.  I also spoke with a CRNA who works with her and was very complimentary.  I think *we* are close to securing her.  On the SLU side, I will send a "letter of intent" which I will sign and she will co-sign and that [is] our form of a contract.  *Since I am new at this in terms of working with SSM on a faculty hire, I will send a copy of the letter to all of you to review.*  I am hoping to have her signed by the end of the week."

Exhibit 62 (emphasis added).

This communication demonstrates that Dr. Siddiqui viewed Plaintiff's recruitment as a joint undertaking between SLU and SSM.  Indeed, he expressly acknowledged that he was "working with SSM" on Plaintiff's hiring and intended to circulate the proposed offer documents to SSM leadership for review and approval before presenting them to Plaintiff.

Exhibit 63 provides even stronger evidence of SSM's involvement in the hiring process.  In that February 11, 2019 email, Dr. Siddiqui sent SSM employees Steve Schoeck, Kyle Grate, and Teresa Kenney a draft letter of intent offering Plaintiff a faculty position with SLU. Dr. Siddiqui wrote:

Attached is the letter of intent I plan to send to Dr. La Scola. I would appreciate it if I can get feedback on this today or by tomorrow.  I would like to send it to her by tomorrow.  This is similar to a "contract" that we send to potential faculty, **which would be contingent on a formal agreement with the PSA**, which I believe we are very close to achieving.  I also need a commitment from SSM on coverage of relocation expenses.

Exhibit 63 (emphasis added).

This email solidifies that Plaintiff's hiring was subject to SSM's review and approval. Before extending an offer, Dr. Siddiqui sought feedback from SSM leaders, conditioned Plaintiff's proposed employment arrangement on finalization of the PSA between SSM and SLU and requested SSM's commitment to fund relocation expenses.  The evidence therefore establishes that SSM was an active participant in the decision to hire Plaintiff and in determining the terms under which she would be employed.

13

In addition to the authority to *hire* Plaintiff, the evidence also demonstrates that SSM and SLU shared authority to terminate Plaintiff.  Exhibit R4 contains an email exchange between Plaintiff and Dr. Siddiqui concerning her March 7, 2019 letter of intent from SLU. During that exchange, Plaintiff advised Dr. Siddiqui that her attorney recommended the agreement expressly provide that, "if it were decided by SLU or SSM to terminate my employment," she would not be subject to the non-compete provision.  Dr. Siddiqui responded the same day that he would consult with legal counsel regarding the requested language and that Plaintiff's proposal reflected "standard practice."

In other words, even before she began working as a urologist at SJ-LSL in 2019 under an agreement with SLU, both Plaintiff and Dr. Siddiqui recognized SSM's authority to terminate Plaintiff's employment.  Stated differently, Exhibit R4 reflects that the parties' contemporaneous understanding that both SLU and SSM possessed meaningful authority over Plaintiff's employment relationship.

The evidence concerning SSM's authority over Plaintiff did not end with Plaintiff's initial hiring.  It continued throughout her tenure at SJ-LSL.  Exhibit C10 contains a series of emails exchanged in June 2022 among Steve Schoeck, Angela Schlansker, SSM's Senior Director of Human Resources, and Rachel Donlan, SSM's Vice President of Strategy. Notably, these communications occurred before Plaintiff's formal employment agreement with SSM became effective.

On June 22, 2022, Schoeck informed Schlansker that he had reached "an impasse" with Plaintiff regarding her SSMMG employment agreement and expressed concern that SSM would be unable to complete the steps necessary to transition Plaintiff into SSM's systems before July 1.  Schoeck recommended that Plaintiff remain employed through SLUCare in order to preserve her "benefits and pay" until the issue could be resolved.  He further stated:

14

Assuming she does show up 7/1 and stay the course as SLUCare employee, I want to ensure she is still on the payroll/benefits/etc. Who best to discuss that with her? Let me know if you'd like me to connect with Dr. Siddiqui on this.

Exhibit C10.

Schlansker, speaking as a senior director of Human Resources, responded that same day and cautioned Schoeck:

I just want to chime in that given her behavioral concerns this may be a good time to visit about this. While I know it will be painful to lose a physician, I just want to make sure we don't make a rash decision about call that negatively impacts the team to retain her.

Exhibit C10.

These communications reveal that before Plaintiff ever had a formal employment agreement with SSM, SSM leaders were actively discussing whether Plaintiff should be *retained* (not *hired*), the impact her departure would have on the organization, and how her employment status should be managed going forward.  Such discussions are consistent with an *employer* exercising authority over employment decisions, not with a third-party lacking control over a contract worker.

Taken together, the witness testimony and contemporaneous emails establish that SSM exercised significant authority over both Plaintiff's hiring and continued employment from July 1, 2019, through June 30, 2022.  From Plaintiff's initial recruitment and the negotiation of her employment terms, and continuing through discussions regarding her retention, SSM was directly involved in decisions that traditionally fall within an employer's domain. This evidence proves that SSM and SLU jointly possessed the power to hire and fire Plaintiff, satisfying one of the most important factors under the economic-realities test.

### 2. *Defendants Jointly Supervised Plaintiff's Work Schedules and Conditions of Employment*

The evidence is equally clear that SSM controlled the manner, means, and day-to-day conditions of Plaintiff's work during the period Defendants contended she was employed *only*

15

by SLU – July 1, 2019, through June 30, 2022.  As previously stated, the PSA (Exhibit W7), dictated the hours, location, and requirements of Plaintiff's work.  Further, the PSA confirmed that Plaintiff was expected to comply with SSM's "medical staff bylaws."  Dr. Siddiqui confirmed in his trial testimony that he did not provide any day-to-day supervision of Plaintiff, and he never performed a performance review on her.  He also confirmed that all direct oversight of Dr. La Scola would have come from the Chief Medical Officer of SJ-LSL—an SSM employee.

In addition, Plaintiff testified that the only hospital she ever worked in was SJ-LSL. SSM provided her with the medical supplies and surgical instruments she used to do her job and employed the staff who assisted her in the clinic.  Mr. Schoeck confirmed that SSM owned or leased all equipment that Dr. La Scola used in the clinic.  Further, Dr. La Scola testified that, at all times, she was obligated to follow the policies and procedures of SSM when working at SJ-LSL.

Additionally, Plaintiff, Dr. Thomas Landon, and Lorraine Bruesch confirmed in their trial testimony that Plaintiff's work schedule was controlled by SSM.  Namely, SSM controlled the hours of operation of the clinic where she saw patients, and the call schedule was jointly created by Plaintiff and Dr. Landon and then given to SSM staff to carry out with the exchange line operator.  Plaintiff's patient appointment schedules were controlled by medical assistants employed by SSM, and Ms. Bruesch confirmed that all supplies for Plaintiff's clinic were ordered by her via SSM—she never ordered clinic supplies for Plaintiff via SLU.

Furthermore, there was ample testimony elicited that, when Plaintiff had concerns about clinic management, she went to **SSM's** human resources department. Ms. Schlansker confirmed in her testimony at trial that SSM's HR department had an obligation to investigate Plaintiff's complaint even *before* she was formally employed by SSM on paper.

16

Consider also the most significant condition of Plaintiff's employment – her partnership with Dr. Landon. That partnership was controlled by SSM. Steve Schoeck testified that he hired Dr. Landon and placed him in the SJ-LSL clinic that Plaintiff was, at that point in time, already running by herself. From then on, Plaintiff and Dr. Landon operated a *joint* clinic– and Dr. Landon works for an SSM entity. Dr. Landon testified that he has been involved with "recruiting and building" the urology department at SSM – the very same department that Plaintiff worked in. Plaintiff and Dr. Landon shared equipment, call burden, covered each other's patients, and worked out of the same operating rooms and clinic office. When Dr. Landon needed help covering patients in the emergency department, he confirmed in his own testimony that he could call Plaintiff, and she would step in. Each aspect of this partnership – the shared space, the shared tools, the shared scheduling – was controlled and orchestrated by SSM.[3]

This level of operational control goes well beyond coordination—it is direct supervision of core employment functions and certainly satisfies the second factor for joint-employer status. *Childress*, 95 F. Supp. 3d at 1139

### 3.   *Defendants Jointly Determined the Rate and Method of Plaintiff's Payment*

In substance, if not in form, SSM controlled both the amount and method of Dr. La Scola's compensation, further confirming SSM's status as a joint employer under the economic-realities test. Although Dr. Siddiqui conveyed Plaintiff's initial compensation offer on behalf of SLU, internal communications between SSM and SLU demonstrate that Dr.

---

[3] Of course, the evidence adduced at trial showed that Dr. Landon was recruited by SLU to be the second physician hired via the PSA alongside Plaintiff. It was only after SLU and SSM decided to offer Dr. Landon a starting base salary of $600,000 per year (which is $200,000 more per year than Plaintiff's starting base salary) that SLU and SSM collectively decided to offer Dr. Landon direct employment by the hospital, a non-profit entity, that had no other employees apart from Dr. Landon.

Siddiqui could not unilaterally determine Plaintiff's salary and required SSM's approval before extending an offer.  As discussed above, Plaintiff's employment offer from SLU was expressly contingent upon SLU and SSM executing the PSA.  *See* Exhibit W7.  The PSA provided that physicians hired by SLU to work at SSM facilities would receive "a *mutually agreed* actual physician compensation (not to exceed $450,000 per year)."  Exhibit W7 (emphasis added).  By its plain terms, therefore, the PSA required SSM and SLU to *jointly* determine Plaintiff's compensation, demonstrating that SSM possessed direct authority over a fundamental term of Plaintiff's employment.

The evidence likewise establishes that SSM and SLU jointly controlled the method of Plaintiff's payment.  *See Childress*, 95 F. Supp. 3d at 1139.  Dr. Siddiqui testified that, although Plaintiff received paychecks from SLU before July 1, 2022, SSM ultimately funded her compensation and benefits.  Specifically, from the inception of Plaintiff's employment on July 1, 2019, through her termination effective December 31, 2022, SSM reimbursed SLU for the compensation and benefits paid to Plaintiff.  This arrangement was expressly memorialized in the PSA.  Thus, while SLU served as the nominal payor for a portion of Plaintiff's employment, SSM approved the compensation structure and bore the economic burden of Plaintiff's wages and benefits.  These facts demonstrate SSM exercised substantial control over both the amount and method of Plaintiff's compensation, satisfying another key factor in the joint-employer analysis.

### 4.  *Defendants Jointly Maintained Plaintiff's Employment Records*

The evidence presented at trial further establishes that SSM maintained Plaintiff's employment records.  Specifically, Plaintiff, Dr. Landon, and Ms. Bruesch each testified that Plaintiff's call schedule was created and maintained by SSM.  Likewise, Plaintiff's wRVU (work relative value unit) data, which measured her physician productivity and was to

18

determine her additional incentive compensation, was generated and maintained by SSM. *See* Exhibit Z7.

SSM also maintained Plaintiff's day-to-day communications regarding her employment. Even before July 1, 2022, when Plaintiff executed a formal employment agreement with SSM, she maintained and used an SSM email address, **deborah.lascola@ssmhealth.com**. *See, e.g.,* Exhibit H9 (Apr. 14, 2022). Notably, Dr. Siddiqui, who contends he was employed solely by SLU during this same period, maintained a SLU email address, **sameer.siddiqui@health.slu.edu**. *See, e.g.,* Exhibit 66 (May 6, 2021). This distinction further illustrates SSM's integration of Plaintiff into its workforce and systems well before July 1, 2022.

The evidence also shows that SSM maintained records relating to employee relations and personnel matters. In April 2022, before Plaintiff entered into an employment agreement with SSM, she reported her workplace concerns to SSM Human Resources. The records associated with that complaint, including the documents generated during the resulting cultural assessment, were maintained by SSM. These are precisely the types of personnel records that employers customarily create, maintain, and rely upon in managing their workforce.

In sum, the evidence presented at trial demonstrates that SSM maintained critical employment records concerning Plaintiff's scheduling, productivity, workplace communications, and human-resources matters even *before* she executed a formal employment agreement with SSM. Those responsibilities are consistent with the role of an employer, not an unrelated third party. Accordingly, the fourth *Childress* factor weighs strongly in favor of a finding that SSM and SLU jointly employed Plaintiff from July 1, 2019 to June 30, 2022. *See Childress*, 95 F. Supp. 3d at 1139.

19

C.      **Courts Across Jurisdictions Have Found Joint Employer Status in Similar Employment Arrangements**

Finally, courts in this jurisdiction and in other jurisdictions have found that two entities jointly employed a worker in similar circumstances.

1.      *Eighth Circuit*

In *Hunt v. State of Missouri Department of Corrections*, 297 F.3d 735 (8th Cir. 2002), the Eighth Circuit considered whether two nurses were jointly employed by both a temporary staffing agency and the Missouri Department of Corrections ("DOC"), which operated the clinic where the nurses worked. *Id.* at 737-38. DOC argued that the nurses were employed solely by the staffing agency and were independent contractors, rather than employees, of DOC. *Id.* at 740.

The Eighth Circuit rejected that argument and held that the nurses were jointly employed by both entities. *Id.* at 743-44 (holding that the plaintiffs "were employees of DOC at all relevant times and therefore had standing to sue DOC under Title VII"). In reaching that conclusion, the court emphasized that the plaintiffs worked under the continuous supervision and control of DOC personnel and that DOC exercised authority over virtually every meaningful aspect of their employment:

> The evidence at trial showed that plaintiffs did not work independently and that they were constantly under the supervision and scrutiny of DOC officials and employees. Furthermore, while plaintiffs were directly paid by [the staffing agency], they did no work for [the staffing agency] other than the [DOC clinic] work. It was DOC that hired them, determined their work duties and schedules, provided the tools and supplies of their work, provided (and sometimes withheld) the doctors' orders they needed to do their jobs, determined and ultimately paid their salaries, and threatened to fire them if they did not get along better with other DOC employees.

*Id.* at 742–43.

The evidence established that Plaintiff was hired to fill SSM's need to staff its community hospitals with board-certified urologists, and that her appointment with SLU was

20

contingent upon SSM's approval.  *See* Exhibits 62 and 63.  Plaintiff further testified that she (1) performed all of her clinical duties at SJ-LSL, an SSM-owned hospital; (2) she relied on SSM staff, equipment, facilities, and resources to perform those duties; and (3) she was required to comply with SSM policies, procedures, and standards governing her clinical practice.  Schoeck, Dr. Siddiqui, and Ms. Bruesch each confirmed these facts.

The evidence also demonstrated that Plaintiff performed no meaningful services directly for SLU apart from the clinical work she performed for SSM patients at SSM facilities.  Thus, as in *Hunt*, all of the work Plaintiff performed for her nominal employer was, in reality, work performed for the entity that controlled her day-to-day duties and benefited from her services.

Finally, although SLU issued Plaintiff's paychecks from July 1, 2019, through June 30, 2022, the evidence established that SSM ultimately funded her compensation during that entire period.  Under the terms of the PSA, SSM reimbursed SLU for 100% of Plaintiff's salary and benefits.  *See* Exhibit W7. Accordingly, just as DOC ultimately paid the nurses' salaries in *Hunt*, SSM bore the economic burden of Plaintiff's compensation notwithstanding the fact that another entity processed her payroll.

In short, the same considerations that led the Eighth Circuit to find joint employment in *Hunt* are present here.  SSM exercised substantial control over Plaintiff's hiring, work location, duties, supervision, resources, and compensation, while Plaintiff performed her services exclusively for SSM's benefit.  Under *Hunt*, these facts strongly support a finding that SSM and SLU jointly employed Plaintiff as a matter of law.

### 2. *Southern District of New York District Court*

The Southern District of New York recently addressed circumstances strikingly similar to those presented here.  In *Hanley v. New York City Health & Hospitals Corp.*, 722

21

F. Supp. 3d 112 (S.D.N.Y. 2024), the plaintiff, a radiologist, was formally employed by a university but assigned to work at an independent hospital pursuant to an affiliation agreement between the university and a medical group. *Id.* at 118, 120. Under that agreement, the university employed radiologists as academic staff and then assigned them to provide clinical services at a hospital owned and operated by the medical group. *Id.* at 118. After the plaintiff brought discrimination claims against both entities, the medical group moved for summary judgment, arguing that it was not her employer. *Id.* at 119.

The court rejected that argument and held that the university and the medical group were the plaintiff's joint employers. *Id.* at 120. In reaching that conclusion, the court emphasized several facts that are equally present here: (1) the medical group controlled the "manner and means" by which the plaintiff performed her clinical duties at the hospital; (2) those clinical duties constituted the overwhelming majority of her day-to-day work and were subject to ongoing oversight by hospital personnel; and (3) although the plaintiff was formally paid by the university, the medical group reimbursed the university for approximately 95% of her salary. *Id.* The court further noted that, while the plaintiff may have been formally hired by the university, her employment agreement specifically contemplated and required her appointment to the hospital as a condition of her continued employment. *Id.*

The facts established at trial are functionally indistinguishable from those in *Hanley*. As in *Hanley*, SSM controlled the manner and means by which Plaintiff performed her clinical duties. Namely, SSM controlled Plaintiff's work schedule, provided the facilities in which she practiced, supplied the equipment and support staff necessary for her work, and controlled the clinical space in which she treated patients. Further, Plaintiff's clinical duties at SJ-LSL comprised the entirety of her urological practice from July 1, 2019 to June 30, 2022.

Moreover, the testimony of Plaintiff, Mr. Schoeck, and Dr. Siddiqui established that the entirety of Plaintiff's day-to-day work was performed at an SSM facility, where Plaintiff was subject to ongoing oversight by hospital personnel, namely, the Chief Medical Officer of SJ-LSL – an SSM employee.  Further, the evidence presented at trial regarding Plaintiff's compensation prior to the effective date of her employment agreement with SSM likewise mirrors *Hanley*.  Namely, although Plaintiff received paychecks from SLU before July 1, 2022, the undisputed evidence presented at trial established that SSM reimbursed SLU for 100% of Plaintiff's salary and benefits during that period.  Accordingly, as in *Hanley*, the entity claiming not to be Plaintiff's employer nevertheless funded her compensation and bore the economic burden of her employment.

In short, *Hanley* involved a physician who was formally employed by a university but, in reality, worked exclusively within and for the benefit of a separate healthcare organization that controlled her clinical practice and funded her compensation.  The same is true here. SSM controlled Plaintiff's working conditions, supervised the environment in which she practiced, tracked her productivity, received the revenue generated by her services, and funded her compensation.  This Court should follow the Southern District of New York's reasoning in *Hanley* and similarly conclude, as a matter of law, that Plaintiff was jointly employed by both SSM and SLU from July 1, 2019, to June 30, 2022.

### 3. *Southern District of Ohio District Court*

In *Rosenberg v. Fairfield Medical Center*, the plaintiff, an orthopedic surgeon, brought claims under the Americans with Disabilities Act ("ADA") against both Fairfield Medical Center ("FMC") and The Ohio State University ("OSU"). No. 18-CV-1111, 2021 WL 3562916, at *1 (S.D. Ohio Aug. 12, 2021).  Although the plaintiff was formally employed by OSU, he was hired to practice at FMC pursuant to an affiliation agreement between the two entities.

23

*Id.* FMC moved for summary judgment, arguing that it was not the plaintiff's employer because he was employed solely by OSU. *Id.*

The relationship between FMC and OSU bears a striking resemblance to the relationship between SSM and SLU. In *Rosenberg*, FMC approached OSU seeking assistance in rebuilding its orthopedic practice and replacing a loss of physicians. *Id.* The parties memorialized that arrangement through a Coverage Agreement that governed the placement of OSU-employed physicians at FMC. *Id.* Notably, the Coverage Agreement expressly disclaimed the existence of a joint venture between the entities. *Id.* at *2. The plaintiff subsequently entered into an employment agreement with OSU, but FMC was not a party to that agreement. *Id.*

Despite the absence of a direct employment contract between the plaintiff and FMC, the Court denied FMC's motion for summary judgment based on its argument that the plaintiff was employed solely by OSU. In reaching that conclusion, the court emphasized that the plaintiff appeared to have been hired by OSU with placement at FMC "in mind specifically" and that, "but-for [OSU's] Coverage Agreement with FMC, the record suggests that [the plaintiff] would not have been hired at all." *Id.* at *6. The court further noted that the plaintiff earned his salary exclusively through the work he performed at FMC and that OSU acknowledged his compensation was directly tied to his ability to provide medical services at the hospital. *Id.* at *7.

The court also identified several additional facts supporting a joint-employer finding: (1) the plaintiff did not practice medicine or perform surgeries at any OSU facility and did not have privileges to do so; (2) FMC provided the offices, equipment, and staff necessary for his practice; (3) nearly all of his scheduling was controlled by FMC; (4) FMC determined whether he would be seeing patients or performing surgeries without input from OSU; (5) he

24

was required to comply with FMC's policies, protocols, and standards; and (6) the relationship between FMC and OSU was jointly marketed to the public. *Id.*

Those same considerations are present here. Like the physician in *Rosenberg*, Plaintiff was hired by SLU specifically to fill a clinical need at SJ-LSL and would not have been hired absent the formal agreement between SLU and SSM via the PSA. *See* Exhibits W7 and 63. Plaintiff likewise earned her compensation exclusively by treating SSM patients and performing surgeries at SSM facilities. Moreover, the evidence established that: (1) Plaintiff practiced and performed surgeries only at SJ-LSL and held no clinical privileges at SLU Hospital; (2) SSM provided the offices, equipment, and support staff necessary for her practice; (3) SSM controlled and managed nearly all aspects of her scheduling; (4) her clinic and operating-room schedules were established without input from SLU; (5) she was required to comply with SSM's policies, procedures, and clinical standards; and (6) the SLUCare-SSM affiliation was marketed to the public as a collaborative healthcare partnership.

In short, the facts that the *Rosenberg* court found were indicative of joint employment are materially indistinguishable from those presented at trial in this case. As in *Rosenberg*, Plaintiff was formally employed by SLU but worked exclusively within, for the benefit of, and under the operational control of SSM. Under the reasoning of *Rosenberg*, the evidence strongly supports a finding that SSM and SLU jointly employed Plaintiff from July 1, 2019, to June 30, 2022.

## CONCLUSION

Based on the foregoing, the evidence presented at trial compels the conclusion that Plaintiff is entitled to judgment as a matter of law on the issue of whether SSM and SLU jointly employed her from July 1, 2019, through June 30, 2022. The evidence established that both entities exercised substantial control over Plaintiff's hiring, compensation, work

25

conditions, and day-to-day responsibilities, satisfying the governing economic-realities test as a matter of law.

Plaintiff is likewise entitled to a new trial on Counts IV and V of her Complaint, which assert claims for discriminatory compensation under the EPA and Title VII for the time period before July 1, 2022. In both counts, Plaintiff sought damages arising from the wage disparity between herself and her male comparator during periods that included her employment before July 1, 2022. Defendants, however, maintained that Plaintiff was employed solely by SLU during that period. As a result of this Court's denial of Plaintiff's motion for judgment as a matter of law (Doc. 142) and its corresponding grant of Defendants' joint motion for judgment as a matter of law on the issue of joint employment (Docs. 146, 147), the jury was instructed to consider only the period from July 1, 2022, through December 31, 2022, in assessing SSM's liability under Title VII and Defendants' liability under the EPA. Consequently, the jury was prevented from considering a substantial portion of the damages period for which Plaintiff contends both Defendants were legally responsible.

Accordingly, pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, Plaintiff respectfully requests that this Court: (1) enter judgment as a matter of law in Plaintiff's favor on the issue of joint employment; (2) rule that SSM and SLU jointly employed Plaintiff from July 1, 2019, through June 30, 2022; and (3) grant a new trial on Counts IV and V so that the jury may consider the full scope of Plaintiff's wage-discrimination claims and resulting damages pre-July 1, 2022.[4]

---

[4] Plaintiff recognizes that, in its order granting partial summary judgment for Defendants (Doc. 105), the Court held that Plaintiff failed to exhaust her administrative remedies as to Defendant SLU and dismissed her Title VII claims against SLU on that basis. Accordingly, Count V proceeded to trial only against Defendant SSM. But Title VII's exhaustion requirement is subject to an exception where "substantial identity exists between the parties before the EEOC and the trial court." *Sedlacek v. Hack*, 752 F.2d 333, 336 (8th Cir. 1985). Substantial identity exists where, among other things, the parties share a "close legal

26

Alternatively, should the Court conclude that the joint-employer issue presents a question for the jury, Plaintiff requests a new trial and asks that the issue be submitted to the jury through appropriate special interrogatories. The Court may submit one or more of the economic-realities factors, or the ultimate question of joint-employer status itself, for jury determination. *See Karlson v. Action Process Serv. & Priv. Investigations, LLC*, 860 F.3d 1089, 1093-94 (8th Cir. 2017). At a minimum, Plaintiff is entitled to have a properly instructed jury decide that issue based on the complete evidentiary record.

Date: July 27, 2026                Respectfully submitted,

                **BLITZ, BARDGETT & DEUTSCH, L.C.**

                By: /s/ Andrew W. Blackwell
                        Kelley F. Farrell, #43027MO
                        Andrew W. Blackwell, #64736MO
                        Ellen J. Bruntrager, #73649MO
                        120 S. Central Ave., Suite 1500
                        St. Louis, Missouri 63105
                        Telephone: (314) 863-1500
                        Facsimile: (314) 881-4828
                        kfarrell@bbdlc.com
                        ablackwell@bbdlc.com
                        ebruntrager@bbdlc.com

                **ATTORNEYS FOR PLAINTIFF**

---

relationship." *Id.* (citing *Stevenson v. International Paper Co.*, 432 F. Supp. 390, 395, 397–98 (W.D. La. 1977)). Thus, if the Court determined as a matter of law that SSM and SLU jointly employed Plaintiff – or if a jury so finds on retrial – Plaintiff should be permitted to pursue her Title VII wage-discrimination claim against SLU because SLU and SSM's joint-employer relationship establishes the substantial identity necessary to satisfy the exhaustion exception.

27

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on July 27, 2026, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

Erin E. Williams, #60935MO
Mallory S. Zoia, #70377MO
Madeline Nebel, #75692MO
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
7700 Bonhomme Avenue, Suite 650
St. Louis, MO 63105
erin.williams@ogletree.com
mallory.zoia@ogletree.com
maddie.nebel@ogletree.com

**ATTORNEYS FOR DEFENDANTS**

<u>/s/ Andrew W. Blackwell</u>